# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:09cv462

| | |
|---|---|
| DONALD C. WEBB, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>K.R. DRENTH TRUCKING, INC., )<br>)<br>Defendant. )<br>) | ORDER |

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (Doc. No. 8) and the related briefs and filings. For the reasons set forth below, the Court will **DENY** the Defendant's motion.

## I. BACKGROUND

Donald Webb's tractor trailer overturned on a clover-leaf interstate exit ramp near Columbia, South Carolina. The accident caused him injuries. His employer, K.R. Drenth Trucking, Inc. ("KRD"), discharged him just six days later, explaining that he had caused a preventable accident by driving too fast on the ramp. Webb contends the real reason KRD terminated him was because he was injured and would require workers' compensation benefits.

The accident occurred in the early afternoon of October 31, 2008. Little information is available regarding the events leading up to the accident. Webb reports he was traveling between 20 and 25 miles per hour on the exit ramp, where the posted speed limit was 30 miles per hour. He claims that while driving around the ramp's curve, a tire on the Defendant's truck burst, causing the load he was carrying to shift and the truck to overturn. A KRD mechanic explained that the tire's tread was completely peeled off rather than blown out at the side wall. The GPS indicates Webb

was traveling 36 miles per hour only seconds before the GPS device malfunctioned. KRD asserts that the GPS malfunction was caused by the accident. After the accident, an officer arrived at the scene and assessed the situation; he did not issue Webb a speeding ticket or citation.

Tom Boettler, general manager of KRD's North Carolina facility, arrived at the scene while Webb was still there. He was joined by Joe Goodman, a KRD maintenance manager and mechanic. Boettler and Goodman observed the overturned truck. Goodman reported to Boettler his opinion that the truck overturned because Webb had driven too fast on the exit ramp, causing the truck's load to shift, which in turn caused the truck's tire to blow and the truck to overturn. But Tony Dykstra, KRD's safety manager, has explained by affidavit that trucks carrying loads of garbage such as the one Webb was driving are not susceptible to shifting that would cause a rollover accident.

Multiple drivers had reported to KRD that the company's GPS systems had been malfunctioning. Other than Webb, at least three other drivers had reported to Boettler or Dykstra that the GPS devices in their trucks had malfunctioned. There is no evidence that KRD followed up on these reports. See (Doc. Nos. 13-1, 13-2, 13-4: Affidavits of Fuller, Ryan, and Afranie). Further, these same three drivers report that while driving for KRD, they experienced frequent tire blowouts, one driver reporting an average of one blowout every week. Two drivers reported that the frequency of their tire blowouts was much higher at KRD than at other trucking companies for which they had worked. (Doc. Nos. 13-1, 13-4: Affidavits of Fuller and Afranie).

Webb refused medical treatment at the scene of the accident, but pain in his back and hips caused him to visit the emergency room the next day, on November 1, 2008. He informed Boettler that he had sought medical treatment in connection with the accident, and Boettler suggested on November 4, 2008, that Webb should visit KRD's physician. On November 5, 2008, Webb returned to work on light duty after visiting the physician. The next day, on November 6, Boettler informed

Webb that he was being terminated for causing a preventable accident. KRD informed Webb that its GPS indicated he had been traveling 36 miles per hour when the accident occurred. Webb had attended a KRD training on July 29, 2008, covering the topic of rollovers. Part of the training included instruction that when entering a ramp or curve, it is a "good idea to . . . reduce speed at least 5 - 10 MPH under the posted speed." (Doc. No. 9-2 at 5). The posted speed was 30 mph where the accident occurred. The copy of the KRD Employee Disciplinary Report provided to Webb, which documents his termination, states that the GPS reports indicate Webb was driving 35 miles per hour when the accident occurred. This number was later altered on the report, and KRD's version has a "6" written over the "5" so that it reads "36" miles per hour, to accurately reflect the GPS report. On or about July 2009, Boettler received a phone call from Glaze Independent Trucking, Inc. requesting a reference for Webb. In response to the request, Boettler stated that Webb had been terminated for causing a preventable accident. Webb hired Allison & Taylor, Inc.("A&T"), a reference checking agency, to contact KRD and obtain a reference for Webb. On February 24, 2009, an agent of A&T contacted KRD and spoke with Boettler. In response to the agent's question regarding the reason for Webb's termination, Boettler responded, "He was let go. He was going too fast and flipped [the truck] over." (Doc. No. 9-10 at 3).

## II.     LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal

citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Webb, in responding to KRD's motion for summary judgment, has requested voluntary dismissal of his third claim for relief (negligent infliction of emotional distress) and his fifth claim for relief (REDA retaliation). These two claims will be dismissed, and the Court does not discuss them further. The remaining claims subject to the Motion for Summary Judgment are Webb's first claim for relief (REDA), second claim for relief (Wrongful Discharge), and fourth claim for relief (Defamation).

### A. REDA

Webb's first claim alleges KRD violated the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241, when it terminated his employment.

REDA prohibits employer retaliation against employees who engage in protected activity by filing claims under several enumerated state statutes concerning employment practices[1] or cooperating with investigations pursuant to claims filed by other employees.

To sustain a claim under REDA, a plaintiff must establish the following: (1) he exercised his right to engage in a protected activity, such as filing a workers' compensation claim; (2) he suffered an adverse employment action; and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. Wiley v. United Parcel Serv., Inc., 594 S.E.2d 809, 811 (N.C. Ct. App. 2004). "'Retaliatory action' means the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. § 95-240(2) (2007). If a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to show, by a preponderance, that it "would have taken the same unfavorable action in the absence of the protected activity of the employee."[2] N.C. Gen. Stat. § 94-241(b).

Webb first must establish that he exercised his right to engage in a protected activity. The parties do not dispute that Webb filed a claim for workers' compensation, which is protected activity under REDA. Wiley, 594 S.E.2d at 811. As to the second element, KRD terminated Webb's

---

[1] See N.C. Gen. Stat. § 95-241(a)(1)(a)-(h) and (a)(5): N.C. Gen. Stat. §§ 97 (North Carolina Workers' Compensation Act); 95, Art. 2A (North Carolina Wage and Hour Act); 95, Art. 16 (North Carolina Occupational Safety and Health Act); 74, Art. 2A (North Carolina Mine Safety and Health Act); 95-28.1 (prohibiting discrimination against any person possessing the Sickle Cell or Hemoglobin C trait); 127A, Art. 16 (National Guard Re-employment Rights); 95-28.1A (prohibiting discrimination based on genetic testing); 143, Art. 52 (North Carolina Pesticide Law of 1971); 90, Art. 5F (North Carolina Drug Paraphernalia Control Act of 2009); and 50B (Domestic Violence).

[2] While some federal courts have applied the Title VII burden-shifting analysis to REDA claims, the North Carolina Supreme Court has not adopted this method, instead applying "the terms of the statute itself." Abels v. Renfro Corp., 436 S.E.2d 822, 825 (1993); see also Smith v. Computer Task Group, Inc., 568 F. Supp. 2d 603, 613 n.10 (M.D.N.C. 2008). Title VII cases do, however, provide "guidance in establishing evidentiary standards and [principles] of law to be applied in discrimination cases." Id. at 827.

5

employment, which is an adverse employment action. Finally, to satisfy the causation element, "a plaintiff may present evidence of close temporal proximity between the protected activity and the adverse employment action, or a pattern of conduct." Smith v. Computer Task Group, Inc., 568 F. Supp. 2d 603, 614 (M.D.N.C. 2008). Here, KRD terminated Webb less than two days after Boettler discussed treatment by KRD's doctor with him. This close temporal proximity satisfies the third prong of a prima facie case for a REDA violation.

KRD contends it would have terminated Webb's employment even if he had not filed a workers' compensation claim, which is an affirmative defense under REDA. It maintains that Webb was speeding, which caused a preventable accident, justifying his termination pursuant to company policy. Webb, on the other hand, claims he was not speeding and that KRD's articulated reason is a pretext for the true reason they terminated him: that he filed a workers' compensation claim. "To raise a factual issue regarding pretext, the plaintiff's evidence must go beyond that which was necessary to make a prima facie showing by pointing out specific, non-speculative facts which discredit the defendant's non-retaliatory motive." Wells v. N.C. Dept. of Correction, 567 S.E.2d 803, 811 (N.C. Ct. App. 2002).

There is a genuine dispute as to the reason KRD terminated Webb's employment. Webb maintains he was driving between 20 and 25 miles per hour and that a blown tire caused the rollover. He presents evidence from three other KRD drivers that they had experienced problems with the company's GPS devices reporting inaccurate data. These other drivers reported the problems to both Boettler and Dykstra, but received no follow up. Further, these same drivers all report that blown tires were a frequent occurrence with KRD trucks, more so than with previous companies for

which they had worked.³  Based on this evidence, a reasonable jury could believe that KRD's alleged reliance on the GPS report, rather than Webb's explanation that a tire blowout caused the accident, was disingenuous.⁴  Finally, the timing of the events at issue, when viewed most favorably to Webb, could also be seen by a jury as indicative of pretext.  The accident occurred on October 31, 2008, but KRD did not immediately terminate him, instead terminating him on November 6, 2008, only two days after the company's doctor confirmed Webb had been injured and restricted him to light-duty work.

Indicative of this genuine dispute is KRD's conflicting affidavits.  KRD attempts to call into question Webb's theory of the accident that a load shifted when the tire blew out.  It offers the Second Affidavit of Tony Dykstra, the company's safety manager.  Dykstra explains that "the loads of garbage carried by KRD trucks are not susceptible to shifting such that they would cause a rollover accident" because they are so tightly packed.  (Doc. No. 16-3 at 1-2).  But Joe Goodman, KRD's maintenance manager for the North Carolina division, contradicts this statement in his own affidavit, stating his opinion that "Webb's truck overturned as a result of Webb driving too fast on the Exit 16A ramp, which caused the truck's load to shift, which in turn caused the truck's tire to blow and the truck to overturn."  (Doc. No. 9-6 at 2).  The credibility assessments required of these witnesses' testimony, where they conflict on this material issue, is best left for a jury.

---

³ KRD has offered evidence that it terminated four other Charlotte area drivers for causing preventable accidents during the time period surrounding the Webb incident.  While this evidence may show the company terminates employees for violating company policy, in the light most favorable to Webb, evidence regarding other terminated drivers does not show that KRD believed Webb caused the accident on this specific occasion.

⁴ KRD has offered the affidavit of Joe Goodman, the maintenance manager for the North Carolina division, as evidence to show that the tire blew out during the accident, rather than prior to it.  The affidavit explains that after the accident, the truck tire tread surface was completely peeled off, indicating the trailer tilted over and the edge came into contact with the tire, peeling it as it spun.  This is a plausible explanation, but it may not be the only explanation for the way the tire blew.  A jury is a more appropriate fact-finder as to this issue than a court determining a summary judgment motion.

While KRD presents much evidence refuting Webb's claim, this information can be weighed by a jury at trial. In the light most favorable to Webb, the nonmoving party, the evidence creates a genuine dispute as to whether KRD terminated him for causing a preventable accident, or instead for exercising his workers' compensation rights. Summary judgment will be denied as to the first claim for relief alleging a violation of REDA.

### B. Wrongful discharge

Webb's second claim for relief alleges wrongful discharge in violation of North Carolina public policy. The parties agree that Webb's wrongful discharge claim rises and falls with his REDA claim. The standards for both claims are nearly identical. Compare Salter v. E & J Healthcare, Inc., 575 S.E.2d 46, 51 (N.C. Ct. App. 2003), with Wiley, 594 S.E.2d at 811. The Court thus agrees with the parties that these two claims rise and fall with each other, and summary judgment will be denied as to the claim for wrongful discharge.

### C. Defamation

Webb's fourth claim for relief alleges defamation, and more specifically, slander per se. He claims that Boettler, while acting as KRD's general manager, communicated false statements of and concerning Webb to prospective employers.

North Carolina law defines slander per se as "an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." Boyce & Isley, PLLC v. Cooper, 568 S.E.2d 893, 898 (N.C. Ct. App. 2002). "[F]alse words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable *per se*." Id. (citation omitted). "[I]n order to be actionable,

8

the defamatory statement must be false. The truth of a statement is a complete defense." Long v. Vertical Technologies, Inc., 439 S.E.2d 797, 801 (N.C. Ct. App. 1994).

As with the REDA and wrongful discharge claims, this claim will also survive summary judgment. Boettler told prospective employers that Webb was terminated from KRD's employment because he caused a preventable accident. KRD does not contest that, if Boettler's statements were false, then Webb would have a claim for slander per se. KRD argues, however, that Boettler's statements to the prospective employers were true and that the verity of these statements provides a complete defense to this claim.

Inherent to the Court's analysis of Webb's REDA claim is that a reasonable jury may believe that the real reason Webb was terminated was not that he caused the accident, but that he filed a workers' compensation claim. Such a finding would mean Boettler's statements to the prospective employers were untrue. As a result, the Court will deny summary judgment as to Webb's fourth claim for relief for defamation.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Defendant's motion for summary judgment (Doc. No. 8) is **DENIED**.

Signed: January 25, 2011

Robert J. Conrad, Jr.
Chief United States District Judge